UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

STEVEN A. CHERNIS,                              :

                    Plaintiff,          :

        -against-                      :

BEATRICE SWARZMAN and                           :
DAVID S. HOCHSTADT,

                              :

                  Defendants.        :

                              :
----------------------------------------------------------x

**OPINION AND ORDER**

05 Civ. 3377 (FM)

**FRANK MAAS**, United States Magistrate Judge.

I.    Introduction

          In this diversity suit, plaintiff Steven A. Chernis ("Chernis"), an attorney

proceeding pro se, seeks compensation for legal services rendered to defendants Beatrice

Swarzman ("Swarzman") and David S. Hochstadt ("Hochstadt").  The parties consented

to my exercise of jurisdiction over this case for all purposes pursuant to 28 U.S.C.

§ 636(c).  (Docket No. 20).  They further agreed to waive a full trial and have this matter

decided through a summary bench trial, in which the Court would make factual findings,

including credibility determinations, on the basis of the parties' written submissions.  (See

Docket No. 21; letter from Chernis to the Hon. Kimba M. Wood, dated May 8, 2006).

          Having reviewed the parties' submissions, for the reasons set forth below,

the Court will direct the entry of judgment against Swarzman and Hochstadt in the

amount of $38,091.29.

II.    Discussion

As a preliminary matter, Chernis urges the Court to disregard the statement of facts in the defendants' memorandum of law because defense counsel is "a stranger, and an incompetent, unqualified, lay or expert witness to the underlying events." (Reply Affirm. of Steven A. Chernis, Esq., dated July 20, 2006[1] ("Chernis Reply Affirm."), at 9). Chernis also contends that "the tender of the Memorandum violates [his] substantial rights to an oath, to pre-trial discovery, and to cross-examination." (Id. at 9-10). Chernis, however, expressly agreed to a summary bench trial in which there would be no live testimony. (See Docket No. 21). Moreover, the defendants' memorandum does not constitute "testimony," or render defense counsel a "witness." Rather, the statement of facts in the defendants' memorandum is properly supported by sworn affidavits. There is consequently no basis for Chernis' application.

That said, my findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure are as follows:

A.    Findings of Fact

1.    Prior Course of Dealings Between Chernis and Hochstadt

In or around 1993 or 1994, Hochstadt hired Chernis to represent him in connection with a dispute involving Hochstadt's former attorney. (Affirm. of Steven A. Chernis, Esq., dated July 20, 2006 ("Chernis Affirm."), at 3; Aff. of David Hochstadt,

---

[1]    Chernis' reply affirmation is clearly dated incorrectly because it responds to the defendants' memorandum of law, which itself is dated July 20, 2006.

sworn to on July 13, 2006 ("Hochstadt Aff."), ¶¶ 2-3).  Hochstadt paid Chernis a $10,000 retainer after Chernis advised him that he would be billed for any fees that exceeded $10,000 at the rate of $275 per hour.  (Chernis Affirm. at 3; Hochstadt Aff. ¶ 3).  The matter was resolved within a few months before the retainer was exhausted.  (Hochstadt Aff. ¶ 3).  Despite the brevity of the engagement, Chernis and Hochstadt became friends and thereafter socialized.  (Chernis Affirm. at 4; Hochstadt Aff. ¶ 4).

By 1994, Hochstadt was the president of his residential cooperative ("Coop").  Acting for the Coop, Hochstadt retained Chernis in connection with another matter.  (Hochstadt Aff. ¶ 5).  Chernis and the Coop entered into a written retainer agreement, dated April 22, 1995, in which Chernis agreed to charge his "standard rate of $275 per hour," discounted ten percent for the first fifty hours and fifteen percent for the next one hundred hours.  (Aff. of Silvana D. Raso, Esq., sworn to on July 13, 2006 ("Raso Aff."), Ex. H at 1-2).  Chernis agreed that his bill for the matter "shall be submitted and will be payable every other month."  (Id. at 2).  However, Chernis first submitted a bill to the Coop after five months, and his final bill was rendered five months later.  (Hochstadt Aff. ¶ 6; Chernis Reply Affirm. at 24).

In November 1995, the Coop again retained Chernis to represent it in connection with a dispute with a neighboring apartment building.  (Hochstadt Aff. ¶ 7).  Chernis did not bill the Coop until May 11, 1999, after the litigation had ended.  (Id.).  In his cover letter enclosing the bill, Chernis stated that "[t]he ostensibly inordinate delay in presenting my bill resulted from nothing other than my own failure, and the trust and

3

good will which I maintain toward the management of [the Coop], its members, shareholders and residents." (Raso Aff. Ex. I). Chernis billed for 250.5 hours of service, at the rate of $275 per hour, or a total of $68,887.50, less a "Professional Discount Per Retainer" of fifteen percent ($453.75) for twelve of his hours. (Id.).

Hochstadt contends that he was "totally outraged" to learn that Chernis had not rendered periodic bills to the Coop in connection with this matter. (Hochstadt Aff. ¶ 8). Hochstadt notes that he was unaware of the more than four year gap in billing because the property manager handled such matters. (Id. ¶ 7). He further avers that he told Chernis "very clearly" that if Chernis ever were retained again, he would not be paid "unless he rendered monthly billings just as other lawyers did." (Id. ¶ 10). According to Hochstadt, Chernis apologized and undertook to bill monthly in the future. (Id.; see also Chernis Affirm. Ex. H (letter from Hochstadt to Chernis, dated July 29, 2003, at 4)).

Chernis disputes Hochstadt's version of the events related to the May 1999 Coop bill. Chernis characterizes Hochstadt's alleged outrage as "false and feigned," noting that "[t]he bill was simply paid and that was the end of it." (Chernis Reply Affirm. at 24). Without going so far as to say that Hochstadt never complained about the lack of periodic billing, Chernis notes that "there is not a single written complaint from Mr. Hochstadt about billing." (Id.) (emphasis added). Thus, in his view, the circumstances of the bill "merely confirmed the custom and practice between [Chernis and Hochstadt], and the casual nature of [their] relationship." (Id.).

4

On April 17, 2000, Chernis sent the Coop a letter, addressed to Hochstadt's attention, which stated that he was increasing his hourly fee to $375 per hour, but would charge the Coop a "courtesy discount" rate of $325 per hour "in light of [their] long history together."  (Chernis Affirm. Ex. B).

    2.    <u>Chernis' Representation of Swarzman</u>

Swarzman is Hochstadt's mother-in-law.  (Hochstadt Aff. ¶ 13).  In or around 1995, she began dating Jerry Rosen ("Rosen"), whose wife, Gladys Rosen ("Gladys"), recently had died.  (Aff. of Beatrice Swarzman, sworn to on July 13, 2006 ("Swarzman Aff."), ¶ 3).  By the following year, their relationship had evolved to the point that Rosen gave Swarzman a diamond ring that had belonged to Gladys.  (<u>Id.</u> ¶ 5).  He memorialized this "gift" in a letter which stated that it was given "without any promises or commitments."  (Raso Aff. Ex. A).  An insurance valuation listed the replacement value of the ring at the time as $73,000.  (<u>Id.</u> Ex. C).

The relationship between Swarzman and Rosen ended in 1999.  (Swarzman Aff. ¶ 12).  Thereafter, on August 24, 2000, Rosen's son, Barry Rosen ("Barry"), demanded that Swarzman return the ring, claiming that it belonged to Gladys' estate.  (<u>See</u> Swarzman Aff. ¶ 13; Raso Aff. Ex. M at 2; Chernis Affirm. Ex. D at 14).  Swarzman apparently expected to be sued and asked Hochstadt for help in finding an attorney to represent her.  (Swarzman Aff. ¶ 15).  Hochstadt contacted Chernis and arranged a meeting.  (Hochstadt Aff. ¶ 12).

On September 1, 2000, Chernis met with Swarzman, Hochstadt, and Swarzman's daughter, Irene Hochstadt ("Irene").  (Swarzman Aff. ¶ 17; Hochstadt Aff. ¶¶ 12-13; Aff. of Irene Hochstadt, sworn to on July 13, 2006 ("Irene Aff."), ¶ 2; Chernis Affirm. at 5).  During the meeting, Swarzman and the others showed Chernis several documents that allegedly proved her entitlement to the ring.[2]  (Swarzman Aff. ¶ 22; Hochstadt Aff. ¶ 15; Irene Aff. ¶ 3; Chernis Affirm. at 5).  After learning the facts, Chernis opined that the New York courts lacked personal jurisdiction over Swarzman, who was a New Jersey resident.  (Hochstadt Aff. ¶ 14).

Chernis did not provide a retainer agreement or letter of engagement during the meeting.  (See Swarzman Aff. ¶ 18; Hochstadt Aff. ¶ 20; Irene Aff. ¶ 9; Chernis Reply Affirm. at 3).  Moreover, "[t]here was never any discussion with [Swarzman] as to what fees would be paid by [her]."[3]  (Swarzman Aff. ¶ 18).  Indeed, because Chernis was Hochstadt's friend, Swarzman "assumed that [she] would not be billed at all or would be billed a minimal amount."  (Id.).  Hochstadt nevertheless told Swarzman, in Chernis'

---

[2]     Chernis challenges the admisibility of these documents on the grounds that they are not properly authenticated and constitute hearsay.  (Pl.'s Mem. at 20).  However, the documents are not offered for the truth of the matters asserted therein.  Their authenticity also does not appear to be open to serious question.

[3]     Although Chernis does not allege that his fees were discussed during this meeting, he does allege that he suggested to Hochstadt that "it would be more economical for [Hochstadt] to use one of his other counsel."  (Chernis Affirm. at 6).  Chernis also notes that "[b]oth [Swarzman and Hochstadt] admit that it was never 'discussed,' promised or agreed by anyone at the meeting of my engagement, or thereafter, that I would represent Ms. Swarzman (i) for 'free,' or (ii) at any reduced rate, or (iii) at any rate other than my standard hourly rate of $375.00 per hour."  (Chernis Reply Affirm. at 3) (last emphasis omitted).

presence, that he "would assist her in paying any reasonable legal fees that may be incurred." (Hochstadt Aff. ¶ 26).

On March 30, 2001, Barry delivered to Swarzman's doorman a summons and verified complaint in an action that he had commenced in Supreme Court, Nassau County, which sought money damages and the return of the ring. (Chernis Affirm. Ex. D at 23). Based on the September 2000 meeting, his study of the documentation, and his professional experience, Chernis believed that the optimal course of action was "to immediately dismiss the action – on motion – from Nassau County, New York. Let [Barry], at his own personal cost, inconvenience, disadvantage and expense, proceed in a foreign forum, in New Jersey." (Chernis Affirm. at 8).

Chernis states that he attended a second meeting with Swarzman, Hochstadt, and Irene on April 13, 2001. (Id. at 10). At this meeting, Chernis allegedly advised Hochstadt to consider retaining a "less expensive" attorney than himself, but Hochstadt rejected the recommendation and instructed Chernis to file an answer. (Id. at 10-11). Swarzman does not recall such a meeting. Indeed, according to Swarzman, after the initial September 1, 2000, meeting, Chernis never called her "to discuss strategy or to propose how he wanted to handle the case." (See Swarzman Aff. ¶¶ 23, 25). The affidavits of Hochstadt and Irene are silent as to whether this meeting took place.

On April 28, 2001, Chernis filed an answer on behalf of Swarzman, asserting that the New York courts lacked personal jurisdiction over her because (a) she

was a resident of New Jersey, and (b) service of process was defective.  (Chernis Affirm. Ex. D at 20).

On June 26, 2001, Chernis filed a motion which was styled as a "Motion for Summary Judgment Dismissing Complaint" pursuant to Rules 3211(a)(8) and 3212 of the New York Civil Practice Law and Rules ("CPLR"), based upon the defenses asserted in the answer.  (See id. at 5-10).  Barry cross-moved for sanctions alleging that Chernis' claim that service upon the doorman was impermissible was "blatantly frivolous."  (Id. at 36).  In his reply papers, Chernis, in turn, sought expenses and attorney's fees for the "frivolous conduct" of Barry's counsel.  (Id. at 80).  Barry filed a surreply, accusing Chernis of having improperly sent the court an ex parte letter and papers which were "derogatory of [Barry] and his counsel, insulting in tone, and filled with unprofessional and unnecessary 'jabs' at [Barry] and/or his counsel."  (Id. at 88-89).  In yet another letter to the court, seeking to respond to Barry's surreply, Chernis acknowledged that he would understand if his letter found "its way to a convenient shredder."  (Raso Aff. Ex. N at I). Nevertheless, Chernis advanced thirteen bullet points, two of which were that

- No attempt [was] made to explain why suit was not commenced in New Jersey, as it should have been.

- No attempt [was] made to explain why this action was not courteously "discontinued" when the reality of the law was made to shine brightly upon counsel's naked eye.  Instead, a "waste" of judicial and other time, money and effort was initiated and perpetrated.

(Id. at III).

On October 25, 2001, the state court referred Swarzman's motion to a hearing officer or other appropriate official to determine whether the court had long-arm jurisdiction over Swarzman and denied the parties' cross-motions for sanctions.[4] (Chernis Affirm. Ex. D at 2-4).  Chernis contends that he obtained Hochstadt's consent to file an appeal from this order (rather than participating in the hearing) during a telephone conversation on October 31, 2001.  (Chernis Affirm. at 17).  Indeed, according to Chernis, "[i]t has always been my practice to inform my client of material developments in the course of litigation . . . . I have never prosecuted an appeal without a client's knowledge and consent."  (Id.).  According to Swarzman, however, "Chernis did not ever write to me or call me regarding any strategy or position he was taking in the case.  He never consulted with me regarding my opinions or ideas after our September 1, 2000 meeting."  (Swarzman Aff. ¶ 28).  Despite Swarzman's assertion, it appears that Chernis was still in contact with Hochstadt because Hochstadt remitted $500 to Chernis as an advance against disbursements on March 9, 2002.  (Chernis Affirm. at 18 & Ex. C at 16).

On November 17, 2001, Chernis filed a notice of appeal with the Appellate Division, Second Department.  (Raso Aff. Ex. O).  Barry then filed a cross-notice of appeal on December 5, 2001.  (Id. Ex. P).  Subsequently, in his appellate brief, Chernis argued that the motion court had erred by directing that a hearing be held to determine

---

[4]       The court treated the motion as a motion to dismiss the complaint pursuant to CPLR 3211(a)(8) for lack of personal jurisdiction.  (See Chernis Affirm. Ex. D at 2).

whether there was personal jurisdiction over Swarzman and denying his motion for sanctions.  (Chernis Affirm. Ex. E).

While the appeal was pending, Barry's counsel sent Chernis a letter, dated April 25, 2002, seeking a stipulation to discontinue the New York action without prejudice so that it could be commenced in New Jersey.  (Raso Aff. Ex. R).  Chernis responded by letter dated April 29, 2002, stating:  "I am perfectly willing to stipulate to the discontinuance of the action, however, I will not agree that it is 'without prejudice.'  I know of no authority which would require that I agree with you on your opinion of the operation of law in this case."  (Id. Ex. S).

On May 20, 2002, Barry filed a motion in Supreme Court, Nassau County, to discontinue the action without prejudice (and requested sanctions) because Chernis had refused to discontinue the action voluntarily, as Barry had requested.  (Id. Ex. T).  Chernis responded with a twenty-two page affirmation in opposition to the motion and in support of his cross-motion for sanctions.  (Id. Ex. U).  In his affirmation, Chernis explained that he had refused to consent to a discontinuance because:

> SWARZMAN, at great expense, vigorously and timely prosecuted and perfected her appeal . . . . She, therefore, can't and won't "contract," agree, or consent (stipulation of discontinuance) to "discontinue [the action] with prejudice" because such an act on her part could result in a judgment terminating the action, rendering the appeal academic or moot, and might prejudice her claim for sanctions against [Barry] which is now an issue to be decided by the Appellate Division.

(<u>Id.</u> at 2) (first alteration in original; emphasis omitted).  Continuing in a similar vein,

Chernis observed:

> What temerity!  We would have gladly consented to a
> discontinuance long,, [sic] long, ago . . . . But the matter is
> now subject to the jurisdiction of the Appellate Division and
> there we can't and won't voluntarily relinquish our claim for
> sanctions and the reimbursement of expenses caused by
> [Barry's] obstinacy, foolishness and greed appearing on the
> face of the record on appeal.

(<u>Id.</u> at 13).  Chernis noted that "Swarzman and [he] felt and feel confident that the

Appellate Division will reimburse [Swarzman's] expenses, as it should, to satisfy the

letter and spirit of Rule 130 which prohibits the frivolous conduct of [Barry] in both

commencing, as well as maintaining[,] this action."[5]  (<u>Id.</u> at 19) (emphasis omitted).

Chernis also explained why he objected to the discontinuance being

"without prejudice":

> The words "without prejudice" were drafted into the proffered
> stipulation of discontinuance, without approval, notice,
> knowledge or consent.  It was rude and non-productive as any
> civilized counsel might have considered.  Moreover, who is to
> say that if the Appellate Division grants the underlying
> previous motion for summary judgment dismissing the
> complaint, what the legal consequences might be in a New
> Jersey Court, if a later action is ever commenced there.
>
> . . . .

---

[5]     Rule 130-1.1 of Title 22 of the New York Compilation of Codes, Rules and
Regulations ("NYCRR") permits a court to award a party or attorney expenses or fees resulting
from "frivolous conduct."

>The grant of "summary judgment" usually constitutes an "on the merits" adjudication.

(Id. at 14-15) (emphases omitted).  Curiously, although Chernis refused to agree to a discontinuance "without prejudice," he argued that he never had insisted on a discontinuance with prejudice.  (Id. at 18).

On May 29, 2002, Barry's counsel submitted a letter to the Appellate Division seeking to have the appeal "held in abeyance" until the lower court had ruled on his motion to discontinue the action.  (Raso Aff. Ex. W).  Chernis opposed that application.  (Id. Ex. X).  In his letter, Chernis stated that "[h]aving invested substantial sums in her defense, Swarzman now must proceed with her claim against [Barry] in this lawsuit, in order to recoup her losses, and she does not want to risk having her New York claim (Rule 130) extinguished by a judgment terminating the action."  (Id. at 3).  He stated further that "Ms. Swarzman is paying me and will continue to pay me to discover and correct all of these continuing misrepresentations of law and fact which [Barry] makes to the Courts!"  (Id.).  Contrary to this representation, Swarzman has submitted an affidavit to this Court which states that she was "shocked" to learn after the fact that Chernis "had fought dismissal of the case claiming that [she] did not consent to the dismissal unless it was 'with prejudice.'"  (Swarzman Aff. ¶ 28).

On June 10, 2002, the Supreme Court entered an order granting Barry's motion and denying Chernis' cross-motion for sanctions.  However, the court awarded Swarzman costs in the amount of $200.  (Raso Aff. Ex. AA at 3).

12

Not satisfied with this result, Chernis submitted another letter to the

Appellate Division on June 14, 2002, stating that

> the claims of Ms. Swarzman, the Appellant, were not
> discontinued.  Her claim now before the Court, predicated on
> 22 NYCRR 130-1.1 ('Rule 130'), was not dismissed, nor
> discontinued, by the trial Court . . . . Ms. Swarzman is entitled
> to an adjudication from the Appellate Division on that
> reimbursement issue, as well as the related issue as to whether
> there was ever any semblance of merit in summoning the
> elderly lady from New Jersey without a predicate of long arm
> jurisdiction.

(Id. Ex. Y).

On July 3, 2002, the Appellate Division affirmed the denial of sanctions

against Barry, stating that "[c]ontrary to [Chernis'] contention, the Supreme Court

properly exercised its discretion."  (Id. Ex. BB).  The court also concluded that

Swarzman's appeal was procedurally defective because

> [t]he portion of the order directing a hearing to aid in the
> determination of the defendant's motion to dismiss the
> complaint pursuant to CPLR 3211(a)(8) does not decide the
> motion and does not affect a substantial right.  Therefore, it is
> not appealable as of right, and leave to appeal has not been
> granted.

(Id.) (citations omitted).  This decision by the Appellate Division concluded the

proceedings in New York.

Chernis views the outcome of the internecine warfare between Barry and

Swarzman as a legal triumph.  As he explains:

> [T]he strategy which I initiated – to attempt to dismiss or put
> an end to the prosecution of the Swarzman action in New

13

> York, before the Hochstadt/Swarzman's [sic] were put to
> great cost, inconvenience and disadvantage in having to
> defend the action as residents of a foreign state – was
> successful, and brought the matter to a close.

(Chernis Affirm. at 19).  Unfortunately, by then, the legal fees for the matter exceeded the

insured value of the ring.  (See id. Ex. C; Raso Aff. Ex. C).  Worse yet, the victory proved

Pyrrhic because the dispute began anew in June 2002, when Barry commenced an action

against Swarzman in New Jersey.  (Hochstadt Aff. ¶ 17).  In their affidavits, Swarzman,

Hochstadt, and Irene express considerable dismay that Chernis' litigation strategy simply

resulted in the suit being refiled in New Jersey.  (See Swarzman Aff. ¶ 27 ("[The

jurisdictional] issue was meaningless to me when I learned that dismissal of the case in

New York only meant that Barry Rosen would be filing the same case in New Jersey.");

Hochstadt Aff. ¶ 17 ("[Chernis] never stated that he would disregard [the merits] entirely

and instead pursue a course of action (the jurisdiction issue) that would cause the

dismissal of the case from the New York State court system and the re-filing of it in the

New Jersey court system in June, 2002."); Irene Aff. ¶ 7 ("It was never discussed or

agreed that Mr. Chernis would charge over $85,000.00 in legal fees arguing that single

issue, only to have the case filed again against my mother in the New Jersey courts.")).

On October 24, 2003, the Superior Court of New Jersey granted summary

judgment for Swarzman, finding that Barry's claim was barred by the New Jersey statute

of limitations.  (Raso Aff. Ex. F).  Swarzman was not represented by Chernis in that case.

(Swarzman Aff. ¶ 29; Hochstadt Aff. ¶ 34).

3.      <u>The Fee Dispute</u>

On June 17, 2003, nearly one year after the last ruling in New York, Chernis sent Hochstadt a bill for his representation of Swarzman.  (Chernis Affirm. Ex. C).  The bill stated that Chernis' "standard rate" was $375 per hour, but that he had billed Hochstadt at a "special discounted rate" of $325 per hour.  (<u>Id.</u> at 15).  Having expended 228.75 hours, Chernis therefore discounted his fee from $85,781.25 to $74,343.75.  (<u>Id.</u>).  After crediting the unexpended portion of the advance for disbursements ($31.21), Chernis sought payment in the amount of $74,312.54.  (<u>Id.</u> at 16).

After Hochstadt received the bill, he left Chernis a telephone message indicating that he was "flabbergasted."  (Hochstadt Aff. ¶ 25).  Chernis, in turn, left a message stating, "I knew that you would have a problem with the bill."  (<u>Id.</u>).  According to Chernis, Hochstadt "always seized upon some reason, some complaint, some lever, or some device to complain about any bill I sent to him so that he could attempt to 'negotiate' downward any amount which I billed.  I have witnessed him do it, and I know – and came to accept – that this is part of his personality."  (Chernis Affirm. at 21).

On June 30, 2003, Chernis and Hochstadt had a lunch meeting during which they discussed the bill.  (<u>Id.</u>).  Hochstadt complained that the amount was too high in light of their friendship.  (<u>Id.</u>).  Chernis responded that Hochstadt had never requested that Chernis handle the matter for free or at a substantial discount, and that he had given Hochstadt a discount of approximately $11,000.  (<u>Id.</u>).

15

On July 21, 2003, after failing to resolve the fee dispute amicably, Chernis

sent Hochstadt a letter, stating:

> [G]iven . . . your unfair practice and approach of attempting to
> "negotiate" virtually all that comes your way, I am left with
> no reasonable alternative but to commence an action in
> quantum meruit against you and Ms. Swarzman for the
> recovery of the reasonable value of my services.
>
> . . . .
>
> You may consider this letter as my final demand for
> payment in advance of suit.

(Chernis Affirm. Ex. H (letter from Chernis to Hochstadt, dated July 21, 2003, at 2)).  In

his July 29, 2003, response, Hochstadt stated:

> I was outraged that you sent a bill for $74,312.54 on a
> $100,000 matter,[6] eleven months after you had ceased work
> on the matter.  Work which you say consisted of 228.75
> hours, over almost a two year period, with no engagement
> letter and no monthly billings.
>
> . . . .
>
> I made it clear to you several years ago . . . when you
> also failed to render a bill[] until the case was over . . . , that
> such conduct on your part was totally and completely
> unacceptable . . . . I told you then, very clearly, that if I ever
> engaged you again in the future, or I referred you to someone
> who engaged you, you had to provide monthly billings or you
> would not get paid.  I made it very clear to you that for you
> not to render monthly billings was not professional or fair to

---

[6]     This apparently was an approximation.  (See Raso Aff. Ex. C) (setting value of
the ring as $73,000).

the client; that rendering one bill at the end of the case is an
outrage and totally inappropriate.

(Id. (letter from Hochstadt to Chernis, dated July 29, 2003, at 1, 4)).

Having gotten nowhere with Hochstadt, on August 5, 2003, Chernis sent a

letter to Swarzman, which stated:

The enclosed bill, which is essentially a duplicate of the bill
originally presented to Mr. Hochstadt, reflects a substantial
courtesy discount which I will honor upon payment, prior to
any suit, if any, which may become necessary to collect the
outstanding balance.

. . . .

Failing to resolve this issue within seven days, I shall be left
with no alternative but to commence an appropriate action
against you and Mr. Hochstadt for the reasonable value of
services rendered which may found [sic] to be in excess of the
net amount of the bill.

(Chernis Reply Affirm. Ex. J).

Chernis thereafter commenced this lawsuit on March 30, 2005.  (See

Docket No. 1).

B.    Conclusions of Law

1.    Breach of Contract

Under New York law, "[t]he compensation of an attorney or counsellor for

his services is governed by agreement, express or implied, which is not restrained by

law."  N.Y. Jud. Law § 474 (McKinney 2005).  In addition, "[a]n attorney has an ethical

obligation to advise his client of the fee arrangement."  In re Jackson, 508 N.Y.S.2d 671,

17

675 (3d Dep't 1986).  When fee disputes arise, courts require attorneys "to show that the contracts are fair, reasonable, and fully known and understood by their clients," Shaw v. Mfrs. Hanover Trust Co., 68 N.Y.2d 172, 176 (1986), because "the relationship between an attorney and his client is a fiduciary one and the attorney cannot take advantage of his superior knowledge and position," Greene v. Greene, 56 N.Y.2d 86, 92 (1982).  Even in the absence of fraud or undue influence, a fee arrangement "may be invalid if it appears that the attorney 'got the better of the bargain', unless he can show that the client was fully aware of the consequences and that there was no exploitation of the client's confidence in the attorney."  Id. at 92.  For matters which began on or after March 4, 2002, attorneys ordinarily are required to provide their clients with written letters of engagement setting forth (a) the scope of legal services to be provided, (b) an explanation of the attorney's fees and expenses to be charged and the attorney's billing practices, and (c) notice of the right to arbitrate fee disputes.  22 NYCRR § 1215.1.

Here, because Chernis' representation of Swarzman began on September 1, 2000, a written letter of engagement was not required.  Nevertheless, Chernis has not shown that he ever discussed the specific terms of his engagement – including his proposed fees – with Swarzman or Hochstadt at any time while he was serving as Swarzman's counsel in connection with the Rosen action.  Accordingly, Chernis has not met his burden of showing that the terms of his retention were "fully known and understood" by his clients, Shaw, 68 N.Y.2d at 176, or that he met his "ethical obligation to advise his client of the fee arrangement," In re Jackson, 508 N.Y.S.2d at 675.

18

Generally, "[t]o create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." Express Indus. & Terminal Corp. v. N.Y.S. Dep't of Transp., 93 N.Y.2d 584, 589 (1999). "If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 482 (1989).

Price is a material term of every service contract. See Ellenburg v. Schneider, 441 N.Y.S.2d 581, 585 (Sup. Ct. Nassau County 1981). For this reason, "a purported contract that leaves the compensation term to be determined by future negotiations is 'a mere agreement to agree' and under New York law is deemed too indefinite to be enforceable." Mar Oil, S.A. v. Morrissey, 982 F.2d 830, 840-41 (2d Cir. 1993) (quoting Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 109 (1981)) (attorney's fee agreement unenforceable because it stated that "hourly rate would be agreed upon at a later date"); Schafrann v. Karam, No. 01 Civ. 0647 (KNF), 2003 WL 289620, at *4 (S.D.N.Y. Feb. 10, 2003) (no enforceable oral agreement for attorney's services because the "essential element" of compensation "was left for future negotiations"). A price term, however, "is not necessarily indefinite because the agreement fails to specify a dollar amount for the future, or contains no computational formula." A contract may still pass muster if the amount can be determined objectively by reference to an extrinsic standard, such as industry practice, that makes its meaning

19

clear "without the need for new expressions by the parties."  <u>Cobble Hill Nursing Home</u>, 74 N.Y.2d at 483.

Chernis contends that his letter to Hochstadt, dated April 17, 2000, put Hochstadt on notice that Chernis' standard fee was $375 per hour.  (<u>See</u> Chernis Affirm. at 4 & Ex. B).  That letter, however, related to Chernis' representation of the Coop pursuant to a written retainer agreement, and it was sent to Hochstadt solely in his capacity as the Coop president.  (<u>Id.</u> Ex. B).  There is no showing that Swarzman or Hochstadt ever agreed to be charged that rate in connection with the <u>Rosen</u> matter.  In fact, Swarzman "assumed that [she] would not be billed at all or would be billed a minimal amount."  (Swarzman Aff. ¶ 18).

Thus, the parties, at best, had "an agreement to agree."  Indeed, Chernis admits that Hochstadt had a practice of treating his bills simply as the starting point for discussions.  (<u>See</u> Chernis Affirm. at 21).  Chernis also recognized the existence of Hochstadt's "practice and approach of attempting to 'negotiate'" legal bills in his letter threatening to initiate this suit unless he was paid.  (<u>Id.</u> Ex. H at 2; <u>see also</u> Hochstadt Aff. ¶ 25 ("I knew that you would have a problem with the bill.")).  Given this acknowledged practice, and Chernis' failure to discuss his proposed fees with Swarzman or Hochstadt at any time before rendering his bill for the <u>Rosen</u> matter, the parties plainly did not reach an agreement as to Chernis' compensation before he undertook the representation or while it was underway.  Accordingly, the contract that Chernis seeks to recover on is unenforceable.

2.     <u>Quantum Meruit</u>

Even in the absence of a written agreement as to fees, an attorney may

recover compensation for services rendered to a client on a <u>quantum</u> <u>meruit</u> basis.  <u>Philip</u>

<u>Irwin Aaron, P.C. v. Joseph Parisi TTEE Parisi Enters., Inc.</u>, 659 N.Y.S.2d 1013, 1013

(2d Dep't 1997).  Chernis is entitled to such an award in this case.

Among the factors that a court may consider in determining the reasonable

value of an attorney's services are:

> (a) the difficulty of the questions involved; (b) the skill
> required to perform the services; (c) the time and labor
> required; (d) the lawyer's experience, ability and reputation;
> (e) the customary fee charged by the Bar for similar services;
> (f) the benefit to the client from the services; and (g) the
> amount involved.

<u>Schafrann</u>, 2003 WL 289620, at *6.

Somewhat remarkably, in his papers, Chernis contends that he should be

awarded fees on a <u>quantum</u> <u>meruit</u> basis at the rate of $500 per hour, rather than his

"standard rate" of $375 per hour.  (Pl.'s Mem. at 15).  However, Chernis fails to provide

any justification for the Court to award him fees at a rate one-third higher than his

standard rate.  Moreover, in <u>Mar Oil</u>, the Second Circuit concluded that an award of

attorney's fees based on a rate higher than the rate that the attorney had billed was "clear

error."  982 F.2d at 842-43; <u>see also</u> <u>Finkelstein v. Kins</u>, 511 N.Y.S.2d 285, 288 (1st

Dep't 1987) ("Absent express agreement, there is no right to increase the bill because of

non-payment."). As the <u>Mar Oil</u> court observed, the "[s]tatements made by an attorney to a client . . . in order to induce payment should generally be binding on the attorney." 982 F.2d at 842-43 (citing cases).

Accordingly, I decline to impose a higher billing rate which would reward Chernis for failing to secure a clear agreement regarding the terms of his engagement before he began to render any services.   I further find that Chernis' reasonable hourly rate for the <u>Rosen</u> matter should be fixed at $325 per hour, the rate that Chernis' bill indicates he hoped to be paid.

Turning to the amount of time that Chernis <u>reasonably</u> spent defending Swarzman, it is apparent that his hours must be significantly reduced for several reasons. To begin, it appears that Swarzman and Hochstadt were not adequately informed that the litigation strategy of having the New York action dismissed on jurisdictional grounds would simply result in the suit being refiled in New Jersey.  (<u>See</u> Swarzman Aff. ¶ 27; Hochstadt Aff. ¶ 17; Irene Aff. ¶ 7).  Indeed, had they known that consequence of Chernis' strategy, they could have opted to waive the personal jurisdiction defense and litigate Barry's claims in New York rather than defend the action a second time in New Jersey.  This undoubtedly would have been more cost effective.

In addition, many of Chernis' litigation maneuvers were patently unreasonable, procedurally defective, and not in Swarzman's best interest.  For instance, Chernis had no legitimate basis to move for sanctions against Barry's counsel when he did.  As the state court noted, Chernis should have sought that relief in a separate motion,

rather than in his reply papers.  It also made little sense to file an appeal from an order which did not deny his motion, but simply referred it for a hearing at which Swarzman likely would have prevailed.  Chernis similarly should not have opposed his adversary's request that the case be voluntarily dismissed "without prejudice" – especially in light his initial strategy, which was to "[l]et [Barry], at his own personal cost, inconvenience, disadvantage and expense, proceed in a foreign forum, in New Jersey."  (Chernis Affirm. at 8).  Finally, although Chernis claims that he discussed the filing of the appeal with Hochstadt, there is no indication that he obtained Swarzman's approval either to bring the appeal or to oppose a voluntary dismissal.  Indeed, Swarzman "was shocked to . . . learn that Mr. Chernis had fought dismissal of the case claiming that [she] did not consent to the dismissal unless it was 'with prejudice.'"  (Swarzman Aff. ¶ 28).

Accordingly, Chernis should not be awarded quantum meruit damages for hours he spent on work which was of no benefit to Swarzman, such as his frivolous application for sanctions, the appeal from the order referring the jurisdictional question for a hearing and declining to impose sanctions, and his insistence that any dismissal be with prejudice.  The earliest time entries that relate to these matters are for legal research and drafting that Chernis undertook between August 2 and 14, 2001, in connection with his reply papers.  Because Chernis' bill does not break down the amount of time that he spent on research and drafting with respect to each particular issue, the Court can only estimate the number of hours that Chernis devoted to these issues during this period. Chernis devoted approximately one sixth of the pages of his reply memorandum of law in

23

support of Swarzman's motion to dismiss to the issue of seeking sanctions, and he billed

approximately 69.75 hours for legal research and drafting related to that memorandum.  I

therefore conclude that 11.625 hours (69.75 hours ÷ 6) should be deducted from Chernis'

time charges during this period.

I also find that Chernis should not be compensated for bringing the

procedurally defective appeal, opposing Barry's voluntary dismissal of the New York

action, or refusing to withdraw his appeal in order to preserve his "claim" for sanctions.

Accordingly, the following entries must be excluded from his award of quantum meruit

damages:

| DATE | SERVICES PERFORMED | HOURS |
|---|---|---|
| November 4, 2001 | Drafted notice of appeal, notice of entry, backs and affidavit of service | 1.5 |
| November 5, 2001 | General review of appellate rules (CPLR) and Appellate Division (2nd Department); Prepared order with notice of entry for service and filing | 1.5 |
| November 17, 2001 | Preparation of Request for Appellate Intervention (for filing notice of appeal on 11-19-01); Preparation for court appearance on 11-19-01 (pursuant to order of Justice Joseph) | 1 |
| November 19, 2001 | Trip to and attendance at Supreme Court, Nassau, for hearing scheduled by the order of Justice Joseph; Conference with Mr. Rosenberg; trip to County Clerk for filing of notice of appeal and request for appellate intervention | 4.25 |
| February 18, 2002 | Preparation for Appellate Division conference; Phone conference with Mr. Hochstadt (re conference); Began review of Appellate Division rules for conference and record on appeal | 0.75 |

| February 19, 2002 | Trip to and appearance at Supreme Court, Nassau County, for pre-appeal Appellate Division conference; Phone conference with Mr. Hochstadt | 3.25 |
|---|---|---|
| February 22, 2002 | Phone conference with appellate printer; Began preparation of record on appeal for printer; Preparation of Statement Pursuant to CPLR 5531 for record; 2d Phone conference with printer (delivery of record); assembled and drafted letter of instruction for printer | 2.75 |
| February 26, 2002 | Receipt and review of proof of Record on Appeal; Began drafting Appellant's Brief | 1.75 |
| February 27, 2002 | Continued drafting of Appellant's Brief and updating of legal research relative to same | 2.75 |
| February 28, 2002 | Continued drafting of Appellant's Brief and updating of legal research relative to same | 2 |
| March 1, 2002 | Continued drafting of Appellant's Brief and updating of legal research relative to same | 2.25 |
| March 2, 2002 | Continued drafting of Appellant's Brief and updating of legal research relative to same | 2 |
| March 3, 2002 | Continued drafting of Appellant's Brief and updating of legal research relative to same | 2.75 |
| March 4, 2002 | Continued drafting of Appellant's Brief and updating of legal research relative to same; began editing | 3.75 |
| March 5, 2002 | Continued and completed editing; Phone conference with appellate printer; made arrangements for service and filing of brief and record on appeal | 4 |
| April 29, 2002 | Receipt and review of letter, and proposed stipulation of discontinuance from Rosenberg; drafted, edited and posted reply; Phone conference with Appellate Division clerk re argument (when no Respondent's Brief); Phone conference with Mr. Hochstadt | 1 |

| May 17, 2002 | Receipt and review of motion to dismiss appeal; Phone conference with Mr. Hochstadt (re motion); Began legal research (grounds to dismiss appeal); Phone conference with Dick Bailey printers (motion calendar; appeals calendar; follow for decisions; arguments); Phone conference with Clerk of Appellate Division (motions to dismiss); Began drafting affirmation in opposition | 3.75 |
|---|---|---|
| May 18, 2002 | Cont'd drafting of affirmation in opposition | 2 |
| May 20, 2002 | Cont'd drafting of affirmation in opposition | 4 |
| May 21, 2002 | Began editing affirmation in opposition; Receipt and review of additional motion in Supreme Court, Nassau County to discontinue action and for sanctions; Receipt and review of notice from Appellate Division (re submission of briefs on appeal); Phone conference with Mr. Hochstadt | 1 |
| May 22, 2002 | Began legal research on motion for sanctions (timely service by Federal Express); Phone conference with Appellate Division (confirm withdrawal of motion to dismiss); Preparation for and began drafting affidavit in opposition to motion for discontinuance and sanctions | 2 |
| May 24, 2002 | Continued research, preparation and drafting of affidavit in opposition to motion for sanctions; research (re defective notice provisions of motion); Phone conference with Ms. Reardon (re defects)[;] drafted and sent letter to Mr. Rosenberg (re defects) | 3.75 |
| May 25, 2002 | Continued drafting affidavit in opposition to motion for sanctions | 3 |
| May 27, 2002 | Continued drafting and began editing affidavit in opposition to motion for sanctions | 3 |

| May 28, 2002 | Continued drafting and editing affidavit in opposition to motion for sanctions; Receipt and review letter from Reardon (re notice); Receipt and review 2nd letter from Reardon (re notice); drafted and edited affidavit of service, litigation backs; final copying, assembly and service of affidavit | 2.25 |
|---|---|---|
| May 30, 2002 | Receipt and review of Fedex letter of Reardon to Appellate Division (re postponement of adjudication); Legal research to examine authorities cited in letter; Phone conference with clerk of Appellate Division (re response to letter); Visit at Supreme Court Nassau County for filing of motion papers in support of cross-motion and in opposition; conference with clerk (re submission); Phone conference with Mr. Hochstadt | 2.75 |
| May 31, 2002 | Drafted, edited and faxed 4 page letter to clerk of the Appellate Division in response to Rosenberg's letter to hold in abeyance; faxed copies to Mr. Hochstadt and Mr. Rosenberg; Phone conference with Mr. Hochstadt; Receipt and review of additional "reply" papers from Mr. Rosenberg, in support and in opposition | 2.5 |
| June 8, 2002 | Receipt and review of Court's decision on motion to discontinue; legal research | 1.75 |
| June 14, 2002 | Receipt and review of letter of the Appellate Division to Mr. Rosenberg acknowledging receipt of his letter of June 10, 2002; Phone conference with Mr. Pelzer (Appellate Division, re same); Drafted, edited and faxed letter response to the Appellate Division | 1.25 |
| June 18, 2002 | Receipt and review of letter from the Appellate Division re post-argument communications | 0.25 |
| TOTAL | | 70.5 |

In sum, of the 228.75 hours that Chernis billed, 82.125 hours (11.625 + 70.5) should be excluded, leaving Chernis with 146.625 hours of recoverable billable

time.  If Chernis were to be awarded fees for this time without further adjustment, he would be entitled to $47,621.92 (146.625 x $325 - $31.21[7]).

I find, however, that one further adjustment needs to be made.  The issues in this case were straightforward and did not warrant an expenditure of nearly 147 hours – more than three weeks of time – by a trial lawyer with extensive litigation experience.  Additionally, as even the handful of excerpts from the papers submitted by Chernis in the Rosen litigation that I have set forth above show, the arguments on behalf of Swarzman could have been made far more effectively with less extensive (and combative) papers.  For both of these reasons, it is appropriate to reduce the time recoverable in quantum meruit by an additional twenty percent to ensure that the judgment entered in this case incorporates only the time that Chernis reasonably expended on the Rosen litigation.

Accordingly, I find that Chernis is entitled to recover fees for 117.3 hours (80% of 146.625 hours) of his time, at a rate of $325 per hour, less $31.21 for the unexpended portion of the disbursements advance, or a total of $38,091.29.

3.    Prejudgment Interest

In addition to fees, Chernis seeks to recover prejudgment interest.  Under CPLR § 5001(a), "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract . . . , except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion."

_____

[7]    The $31.21 credit reflects the unexpended portion of Hochstadt's $500 advance for disbursements.  (Chernis Affirm. Ex. C at 16).

Courts disagree as to whether an award of prejudgment interest on a quantum meruit

recovery is discretionary or mandatory.  Compare Precision Founds. v. Ives, 772

N.Y.S.2d 116, 120 (3d Dep't 2004) (prejudgment interest is "discretionary for a quantum

meruit claim"), and Sequa Corp. v. Gelmin, GBJ Corp., No. 91 Civ. 8675 (DAB), 1997

WL 218470, at *3 (S.D.N.Y. Apr. 30, 1997) (prejudgment interest is discretionary when

awarding attorney's fees in quantum meruit), with Aniero Concrete Co. v. N.Y. City

Constr. Authority, 308 F. Supp. 2d 164, 211 (S.D.N.Y. 2003) ("While . . . the roots of

quantum meruit are found in principles of equity, for purposes of prejudgment interest the

remedy is likened to one for breach of contract, and an award of prejudgment interest is

mandatory."), and Ash & Miller v. Freedman, 495 N.Y.S.2d 183, 183 (1st Dep't 1985)

("[A]n award of interest would be mandated in an action by an attorney to recover under a

retainer agreement or in quantum meruit for the reasonable value of the legal services

rendered.").

   The better reasoned cases, in my view, support the proposition that such an

award is discretionary.  For example, in Sequa Corp., Judge Batts noted:

> Clearly, the language in [CPLR] § 5001(a) only requires the
> awarding of interest when a sum is awarded upon the breach
> of a contract.  In equitable actions, such as the awarding of
> attorney's fees under quantum meruit . . . , the awarding of
> interest [is] in the Court's discretion and is not required.  To
> construe [CPLR] § 5001(a) as requiring the awarding of
> interest in equitable actions would contravene the clear and
> unequivocal language of the statute and disregard basic rules
> of statutory construction.

Sequa Corp., 1997 WL 218470, at *3 (citation omitted).

Here, the present dispute presumably could have been avoided, or the impact of Chernis' ill-advised strategy mitigated, had Chernis presented Swarzman and Hochstadt with an engagement letter or written retainer agreement and periodic bills. Instead, anticipating that Hochstadt would "attempt to 'negotiate' downward any amount which [he] billed," (Chernis Affirm. at 21), Chernis apparently chose to surprise Hochstadt and Swarzman with a single lump-sum bill at the end of his representation. He also failed to inform Swarzman and Hochstadt adequately that his strategy of challenging jurisdiction would likely simply result in the recommencement of the New York action in New Jersey, or to afford them the choice of waiving a personal jurisdiction defense and litigating the action in New York. For these reasons, among others, I decline to award prejudgment interest.

III.   Conclusion

For the foregoing reasons, the Clerk of the Court is directed to enter judgment against Swarzman and Hochstadt in the amount of $38,091.29.

SO ORDERED.

Dated:        New York, New York
              August 2, 2007

                                        _____.
                                        FRANK MAAS
                                        United States Magistrate Judge

30

Copies to:

Steven Chernis, Esq.
27 West 86th Street
New York, New York  10024

John A. Schepisi, Esq.
Schepisi & McLaughlin, P.A.
473 Sylvan Avenue
Englewood Cliffs, New Jersey  07632